# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LAUREN MAY H.,

              Claimant,

      v.

FRANK J. BISIGNANO,
Commissioner of Social Security,

            Respondent.

No. 23 C 2165

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

Lauren May H.[1] ("Claimant") seeks judicial review of the final decision of the Commissioner of Social Security[2] ("Commissioner"), denying her application for disability and supplemental security income benefits. The parties consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment, pursuant to 28 U.S.C. § 636(c). [ECF No. 33]. After reviewing the record and the parties' briefs, the Court grants Claimant's Motion for Summary Judgment [ECF No. 19] and denies the Commissioner's request for summary judgment in Defendant's Response to Plaintiff's Motion for Summary Judgment [ECF No. 27] ("Response").

---

[1] In accordance with Northern District of Illinois Local Rule 8.1, the Court refers to Claimant only by his first name and the first initial of his last name.

[2] Frank J. Bisignano was confirmed as the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, he is automatically substituted as the named defendant in this case.

## I.    Procedural History

On March 31, 2020, Claimant filed an application for a period of disability and disability insurance benefits and also filed a Title XVI application for supplemental security income. (R.38). Claimant alleged a disability beginning March 15, 2019. (R.38). The application was denied initially and on reconsideration after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R.38). A telephone hearing was held on April 4, 2022, at which Claimant was represented by an attorney. (R.38). A vocational expert also testified. (R.38). The ALJ issued a decision on July 15, 2022, finding Claimant not disabled under the Social Security Act denying benefits. (R.38-58). The Social Security Administration Appeals Council denied Claimant's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R.1-7). Claimant filed this lawsuit seeking judicial review of the Commissioner's decision, and this Court has jurisdiction pursuant to 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## II.    The ALJ's Decision

Under the Social Security Act, disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part, sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Commissioner must determine whether: (1) the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) the

2

claimant has a severe impairment or combination of impairments; (3) the claimant's impairments or combination of impairments meet or equal any listed impairment; (4) the claimant retains the residual functional capacity ("RFC") to perform any past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. *Id.*; *see Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). The claimant bears the burden of proof at steps one through four, and the burden shifts to the Commissioner at step five. *Gedatus v. Saul,* 994 F.3d 893, 898 (7th Cir. 2021); *Wilder v. Kijakazi,* 22 F.4th 644 (7th Cir. 2022). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

Applying the five-part test in this case, the ALJ found at step one that Claimant had not engaged in any substantial gainful activity since March 15, 2019, the alleged onset date. (R.41). At step two, the ALJ found Claimant had the following severe impairments: bipolar disorder, depression, anxiety, and fibromyalgia. (R.41). At step three, the ALJ found that Claimant did not have any impairment or combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (R.41-44). With respect to Claimant's mental impairments, the ALJ undertook the paragraph B analysis[3] and determined that Claimant had mild limitations in

---

[3] To determine whether a mental impairment meets or equals listing level severity at step three of the sequential analysis, a claimant must prove she meets the severity criteria of either paragraph B or C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. To satisfy the paragraph B criteria, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two" of four areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and

understanding, remembering or applying information, and in adapting and managing herself, and that Claimant has moderate limitations in interacting with others and in concentrating, persisting or maintaining pace. (R.41-43). Before step four, the ALJ determined:

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can never climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, and crawl. The claimant can never work at unprotected heights, never work with moving mechanical parts, and never operate a motor vehicle. The claimant is able to perform simple and routine tasks; perform simple work-related decisions; and to make simple work-related decisions. The claimant is able to occasionally interact with supervisors, coworkers, and the public.

(R.44). At step four, the ALJ found that Claimant is unable to perform any past relevant work. (R.56). At step five, the ALJ found there were jobs in the national economy Claimant could perform based on the testimony of the vocational expert who opined that Claimant could perform the jobs of box bender, carton catcher, and hand packager. (R.58). Based on these findings, the ALJ concluded Claimant was not disabled. (R.58).

## DISCUSSION

### I. Standard of Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,

---

adapting and managing oneself. *Id.* To evaluate these four areas, ALJs will investigate how an impairment interferes with a claimant's ability to function independently, appropriately, effectively, and on a sustained basis, as well as the quality and level of overall functional performance, any episodic limitations, the amount of supervision or assistance required, and the settings in which a claimant is able to function. 20 C.F.R. § 404. 1520a(c)(2).

shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision, therefore, is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the correct legal standard in reaching her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). An ALJ's decision should be affirmed even in the absence of overwhelming evidence in support: "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence is ... 'more than a mere scintilla.' ... It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, (2019) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The Seventh Circuit has made clear that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053-54 (7th Cir. 2024) (citations omitted). More specifically, the Seventh Circuit stated:

> All we required is that ALJs provide an explanation for how the evidence leads to their conclusions that is "sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review." … At times, we have put this in the shorthand terms of saying an ALJ needs to provide a "logical bridge from the evidence to his conclusion."

*Id.* at 1054 (citations omitted). When conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls

upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict.") (internal quotations and citation omitted). The court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

## II.  Analysis

Claimant argues the ALJ's decision cannot stand in this case because: (1) the ALJ failed to properly evaluate medical opinion evidence; and (2) the ALJ's evaluation of Claimant's subjective symptoms was not supported by substantial evidence. *See* Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment [ECF No. 20] ("Motion"). The Court addresses these arguments below.

### A.  The ALJ's evaluation of the medical opinion evidence is not supported by substantial evidence.

Claimant argues the ALJ's reasons for rejecting the opinion of Claimant's treating nurse practitioner, Benton Waystout, in favor of the opinions of the non-examining state agency consultants were legally improper and unsupported by the record. Motion [ECF No. 20] at 11-17. Claimant says "the ALJ erred by failing to

6

articulate how he considered evidence relevant to the factors of supportability and consistency when evaluating the medical opinion evidence concerning Ms. Haynes' mental functioning . . ." *Id.* at 16-17.

The parties agree that because Claimant filed her claim in 2020, the ALJ was required to evaluate the medical opinion evidence under regulations applicable to claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c (2017). An ALJ "will not defer or give any specific weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from a [claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ will explain "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). In deciding how persuasive a given opinion or finding is, the ALJ considers "supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict" the opinion or finding. *Victor F. v. Kijakazi*, 2023 WL 2429357, at *3 (N.D. Ill. Mar. 9, 2023). "Supportability and consistency are the two most important factors." *Id.* An ALJ must explain how he "considered the factors of supportability and consistency, but he is not required to explain how he evaluated the other factors." *Id.* Although a "detailed analysis is not required," the ALJ must "give a reviewing court the bridge to connect the outcome to the record." *Id.*

The ALJ summarized the findings in Nurse Practitioner ("NP") Waystout's November 4, 2021 Psychiatric/Psychological Impairment Questionnaire, which

opined Claimant had marked or moderate to marked limitations in most functional areas, but concluded the opinion was "not persuasive" because "it was written with two different person's handwriting," it "recites the claimant's own subjective allegations," and "while the medical evidence in the records shows some limitation in regard to the claimant's mental health, the longitudinal evidence does not support limitations to the extent noted in this opinion (i.e., marked or moderate-to marked limitation in nearly all mental activities)." (R.55-56). Claimant challenges all of the ALJ's reasons for discounting NP Waystout's opinion.

The ALJ's first reason for finding NP Waystout's opinion not persuasive is the one sentence statement that his opinion was written with two different people's handwriting. Motion [ECF No. 20] at 11-12. The Commissioner does not defend this rationale but says the ALJ's other stated reasons for rejecting NP Waystout's opinion are sufficient and therefore the Court can affirm on those other grounds – essentially a harmless error argument. Response [ECF No. 27] at 9 n.5 (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009)). In her Reply, Claimant disputes that this was harmless error. Plaintiff's Reply Memorandum in Further Support of Plaintiff's Motion for Summary Judgment [ECF No. 29] ("Reply") at 1. Claimant notes the ALJ listed the handwriting issue as the "first and foremost reason for rejecting" NP Waystout's opinion and says "[i]t is impossible to know how heavily the ALJ weighed the improper conclusion regarding the handwriting . . . because the ALJ failed to explain this." Reply [ECF No. 29] at 1. Claimant also says other courts have found

similar reasoning to be reversible error. *Id.* (citing *Muzzey v. Berryhill*, 2019 WL 697137, at *5 (N.D. Ind. Feb. 20, 2019)).

The ALJ's criticism of NP Waystout's opinion because it apparently contained "two different person's handwriting" does not suffice as substantial evidence for rejecting the opinion. The ALJ does not explain why it is significant that two different handwritings were allegedly used, nor did the ALJ explore reasons why this may have been so during the hearing or in his opinion. It is also not clear that the ALJ's focus on the handwriting used in NP Waystout's opinion was harmless error. *See Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) ("An error is harmless if, upon examination of the record, the court can "predict with great confidence what the result of remand will be"). A harmless error analysis is arguably more difficult here because it requires the Court to speculate as to the weight the ALJ gave this erroneous handwriting consideration. Nonetheless, the Court recognizes the Commissioner's argument that the ALJ's other stated reasons for rejecting NP Waystout's opinion provide substantial evidence supporting that decision and therefore considers those other reasons.

The ALJ's second stated reason for rejecting NP Waystout's opinion is that it "recites the claimant's own subjective allegations" (R.56). The Court again agrees with Claimant this is an improper reason for rejecting the opinion. The ALJ did not provide any explanation for this criticism. Courts have explained it is "illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms." *Aurand v.*

*Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016). "Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (citing *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("psychiatric assessments normally are based primarily on what the patient tells the psychiatrist")). "[T]his is not to say that an ALJ may never consider the fact that a mental health assessment was largely based on a claimant's subjective reporting. A mental-health provider can be too uncritical or accepting of a patient's subjective complaints, or may not adequately assess those complaints through the 'objective lens' of his or her professional expertise." *Michael G. v. Kijakazi*, 2022 WL 4119775, at *14–16 (N.D. Ill. Sept. 9, 2022). But here, the ALJ did not say that that NP Waystout failed to apply his professional expertise in considering Claimant's subjective symptoms. Moreover, although the ALJ discussed NP Waystout's treatment records elsewhere in the opinion, the ALJ did not address whether that treatment history supported NP Waystout's opinion or his consideration of Claimant's subjective allegations. (R.52-53, R.56). The Court will not speculate as to what the ALJ meant by this one-sentence criticism and therefore concludes the ALJ's second stated reason for rejecting NP Waystout's opinion is not supported by substantial evidence.

That leaves the ALJ's final stated reason for finding NP Waystout's opinion not persuasive: a one-sentence statement that "while the medical evidence in the records shows some limitation in regard to the claimant's mental health, the

longitudinal evidence does not support limitations to the extent noted in [NP Waystout's] opinion (i.e. marked or moderate-to marked limitations in nearly all mental activities." (R.56). The ALJ summarized NP Waystout's opinion as to Claimant's abilities, noting he found Claimant had marked or moderate to marked limitations in almost all functional categories and noted that NP Waystout "cannot conceive of any activity that the claimant could perform without guidance or supervision." (R.55-56).

As an initial matter, the conclusory statement that NP Waystout's opinion about Claimant's limitations is not supported by the longitudinal record does not, standing alone, provide substantial evidence supporting the ALJ's decision. *See, e.g.*, *Patrice W. v. Kijakazi*, 2022 WL 2463557, at *4 (N.D. Ill. July 6, 2022) ("the ALJ's conclusion that Dr. Dolan's opinions were inconsistent with 'the record as a whole' is . . . unexplained and perfunctory . . . 20 C.F.R. §§ 404.1520c(b)(2) required the ALJ to explain how Dr. Dolan's opinion was inconsistent with and/or unsupported by the record, but the ALJ provided only a rote conclusion . . . This alone warrants remand."); *Gray v. Colvin*, 2016 WL 160733, at *7 (N.D. Ind. Jan. 13, 2016) ("Simply stating that the treating physician's opinion is 'not consistent with the longitudinal treatment records . . .' is not an analysis, but rather a conclusory opinion without support. This Court is left to guess what treatment records the ALJ is referring to, as well as the ways in which they are inconsistent."). The ALJ did not explain what parts of the record did not support the mental health limitations identified by NP Waystout.

The Commissioner appears to, at least implicitly, acknowledge this but argues the ALJ provided sufficient support for his conclusion at step three where the ALJ analyzed Claimant's functional abilities and found only mild or moderate limitations in each category. Response [ECF No. 27] at 4 ("At the third step of the sequential evaluation, the ALJ found that the evidence showed plaintiff's mental impairments caused mild limitation in understanding/remembering/applying information (URA) and adapting/managing, and moderate limitations interacting with others and concentrating/persisting/maintaining pace (CPP). AR 42-43. This contradicts Nurse Waystout's assessment of marked limitations in every domain [] so the ALJ's step three analysis is relevant to his later conclusion that the "longitudinal evidence does not support limitations to the extent" Nurse Waystout opined."). Citing *Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021), the Commissioner argues the Court must consider the ALJ's opinion holistically and the ALJ's analysis at step three is sufficient to support the ALJ's finding that NP Waystout's opinion was unsupported by the longitudinal record, a finding which, in turn, supported the RFC with lesser mental health limitations. *Id.*

In the Court's view, the circumstances in *Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021) are distinguishable. In that case, the Seventh Circuit noted "the ALJ's discussion of the medical evidence in the section of his decision addressing Zellweger's RFC" was "quite detailed, and it easily supports the ALJ's step-three rejection of Zellweger's claim of per se disability under Listing 1.04." Here, by contrast, the Commissioner argues, in a sense, the inverse of this scenario, saying the

ALJ's step three analysis of whether Claimant's functional abilities met listing levels should be sufficient to support the ALJ's rejection of the functional limitations in NP Waystout's opinion (and correspondingly, the adoption of an RFC with lesser limitations) without further explanation. As the ALJ noted, the step three findings "are not a residual functional capacity assessment" and "[t]he mental residual functional capacity assessment used at steps 4 and 5 . . . requires a more detailed assessment of the areas of mental functioning." (R.44). Courts have remanded where "there was no 'more detailed assessment' of plaintiff's mental residual functional capacity thereafter." *See Colleen G. v. Kijakazi*, 2024 WL 216666, at *9 (N.D. Ill. Jan. 19, 2024) (collecting cases); *see also Joshua J. H. v. Kijakazi*, 2022 WL 2905673, at *5 (N.D. Ill. July 22, 2022) (rejecting Commissioner's argument that "ALJ's discussion of relevant evidence at step three supports the ALJ's RFC limitation to occasional interactions with coworkers"; while ALJ had discussed at step three the impact of claimant's mental impairments on his ability to interact with others as well as certain activities claimant could engage in and that claimant "appeared cooperative, friendly, pleasant, engaged, polite, positive, smiling, and calm during exams and generally had good eye contact" nevertheless "the ALJ failed to explain, nor is it self-evident, how any of this evidence demonstrates an ability to occasionally interact with coworkers"). The Court disagrees that the ALJ's step three analysis necessarily provides substantial evidence supporting the ALJ's rejection of NP Waystout's opinion as not supported by the longitudinal record.

13

Claimant also argues the ALJ's characterization of the record was "based on a gross distortion . . . that mental status findings in the record are unremarkable" including specifically the findings of the November 6, 2020 consultative examination. Motion [ECF No. 20] at 18. The ALJ supported his rejection of Claimant's description of her symptoms as not entirely consistent with the record evidence by stating "[w]hile there were some deficits present during mental examinations on occasion, a psychological consultative examination conducted on November 6, 2021 was unremarkable." (R.46.)[4] The ALJ also stated further restriction beyond the mental health limitations in the RFC "was unwarranted" because "examinations were largely normal," again noting Claimant's "characterization of her symptoms is not consistent with or supported by the medical records." (R.56). The Commissioner does not attempt to defend the ALJ's characterization of the consultative examination as unremarkable but says it does not matter because "the ALJ fully considered these abnormal findings both at step three and in the RFC narrative." Response [ECF No. 27] at 6-7.

In the Court's view, it cannot ignore the ALJ's conclusion that the consultative examination was unremarkable simply because the ALJ included a detailed summary of that examination elsewhere in the opinion. The fact that the ALJ considered what the Commissioner concedes were "abnormal findings" from the consultative examination does not permit the Court to infer why the ALJ ultimately concluded that examination was "unremarkable." To the contrary, the ALJ's

---

[4] The Court views the ALJ's reference to the date of the consultative examination as November 6, 2021 instead of November 6, 2020 as a typographical error. (R.46.)

14

conclusion that the consultative examination was "unremarkable" was, in the Court's view, at best, unexplained, and at worse, internally inconsistent with the ALJ's summary of that examination elsewhere in his opinion. (R.46; R.55).

At step three, in addressing the category of interacting with others, the ALJ described the consultative psychological evaluation as follows:

> the claimant was friendly and maintained a fair level of eye contact with the examiner, but was extremely upset during the interview (Exhibit 6F/1). Her speech was also clear, but she was rambling due to her extreme anxiety, and she rocked incessantly, drawing and coloring during the interview. The claimant reported that she has been unable to work since 2017 due to her anxiety and social aversion (Exhibit 6F/2). She stated that two years earlier, she was attacked and held hostage for four months by her husband and his friends, during which time she endured physical and emotional abuse every day. The claimant reported a history of depression and PTSD following the prolonged abuse she endured.

(R.42-43). The ALJ stated "[o]f note, at a psychological evaluation conducted on November 6, 2020, the claimant the claimant put forth a fair level of cooperation during the interview, but was distracted, preoccupied, and negativistic (Exhibit 6F/2). Other examinations have also shown instances of inattentiveness." (R.43). The ALJ also noted during the consultative examination "the claimant presented evidence of intact judgment and insight" and presented to the examination adequately groomed and appropriately dressed but observed "[n]evertheless, other examinations have also shown instances in which the claimant's judgment is impaired and impulsive." (R.43). With respect to Claimant's ability to understand, remember and apply information, the ALJ noted Claimant "put forth good effort in tasks used to gauge her mental capacity, presenting evidence of intact abilities" during the examination, referencing her ability to recall "six digits forward and four backward," to "accurately report[] the

previous day's weather, what she had for dinner the previous evening, and the directions she used to reach the interview facility," "name the current President and his predecessor" and, although "she was unable to name any other recent President, she correctly named the first President of the United States" and "presented evidence of intact arithmetic skills." (R.42). The ALJ observed the consultative psychologist "noted that during the course of the evaluation, the claimant's speed of thought was normal, and her coherence was average, although her thoughts were overly flexible, and her level of suggestibility was moderately increased." *Id.*

At step four, the ALJ summarized the consultative examination adding many additional and seemingly abnormal details about Claimant's mental health during that examination that were not addressed by the ALJ at step three. The ALJ noted Claimant "reported experiencing symptoms of depression with a severity of seven on a scale from one to ten" as well as "feelings of hopelessness, lethargy, sleep problems, psychomotor agitation, feelings of worthlessness, and frequent tearfulness stating 'I'm not normal.'" (R.51-52). Claimant said she attempted suicide one month earlier and "reported current occasional suicidal ideation." *Id.* The psychologist stated Claimant's "thought content was characterized by the absence of delusions, but she presented obsessive ideas of a mild intensity and ruminative ideation and phobias of a moderate intensity." *Id.* The psychologist noted "claimant reported the presence of auditory hallucinations, saying, 'sometimes I hear my son'" and "previously experienced a hallucination due to sleep deprivation, which led to her hospitalization." *Id.* The psychologist reported Claimant's "insight was also impaired,

16

and her consciousness somewhat confused, but her orientation to time, location, place, and person were unimpaired." *Id.* The ALJ concluded by stating the psychologist "assigned a diagnostic consideration of post-traumatic stress disorder." *Id.*

The Court finds the ALJ's descriptions of the November 2020 consultative examination throughout his opinion to be internally inconsistent with the ALJ's conclusion that the examination was "unremarkable." The ALJ does not reconcile his "unremarkable" characterization with any of the abnormal behaviors he described during the consultative examination, including Claimant's extreme anxiety; suicidal ideation; distracted, preoccupied and negativistic behavior; depression; hallucinations; impaired insight; and obsessive ideas and phobias.

Moreover, the ALJ did not explain why his description at step three of certain more normal findings from the consultative examination, such as Claimant's ability to perform basic arithmetic, recall series of digits, or name recent presidents, render that examination "unremarkable." Nor does the ALJ explain how his analysis at step three supports the ALJ's rejection of NP Waystout's opinion that Claimant had marked limitations in "remembering locations and work-like procedures," "maintaining attention and concentration for extended periods," "working in coordination with or near others without being distracted by them, completing a workday without interruptions from psychological symptoms, performing at a consistent pace without rest periods of unreasonable length or frequency," or that Claimant had "moderate to marked limitation understanding and remembering one-

17

to-two step instructions; carrying out simple, one-to-two step instructions; [and] making simple work-related decisions." (R.55-56).

In addition, the ALJ did not explain how his step three analysis finding Claimant had only moderate limitations in interacting with others provides substantial evidence to support the ALJ's rejection of NP Waystout's conclusion that Claimant had marked limitations in "working in coordination with or near others without being distracted by them," "interacting appropriately with the public," and "accepting instructions and responding appropriately to criticism from supervisors" and moderate to marked limitations in "getting along with coworkers or peers without distracting them; and maintaining socially appropriate behavior." (R.55-56). The ALJ's explanation at step three was based on two cited exhibits, which the ALJ said generally showed "that during examinations and office visits the claimant was calm, appropriate, polite, pleasant, and cooperative." (R.42-43 (citing Exhibits 2F/7 & 7F/6)).

As an initial matter, the ALJ does not explain why Claimant's presentation during examinations was necessarily inconsistent with NP Waystout's findings regarding Claimant's limitations in interacting with others during full-time work. Moreover, the two exhibits cited by the ALJ do not provide support for the ALJ's characterization of how Claimant "generally" presents during examinations. The Court acknowledges one of the exhibits, Exhibit 7F, a report from an Internal Medicine Consultative Examination on December 5, 2020, found Claimant's "[a]ppearance, behavior and ability to relate during the examination were normal"

18

and that she was "appropriate, polite, pleasant and cooperative." (R.665-672 at R.668)). The ALJ did not address, however, that this was an internal medicine not a *mental health* examination, nor did the ALJ explain how he reconciled the mental health findings from the internal medicine examination with the seemingly inconsistent results of the psychological examination one month earlier.

The other cited exhibit, Exhibit 2F, is Claimant's Discharge Summary from her inpatient hospitalization in September 2019. The ALJ cited one page containing a "Brief Summary of Patient's Psychiatric, Physical and Functional Condition at Discharge" stating "patient is calm and cooperative, compliant with medications. Denies suicidal ideation. No pain or psychosis." (R.499 (Exhibit 2F at 7)). But the ALJ did not acknowledge or address other contradictory findings in the Discharge Summary, including a diagnosis of bipolar disorder and depression, multiple medication prescriptions, and a description of "Mental Status at Time of Discharge" stating "[t]he patient is oriented to person, situation, place, and time. Appearance, disheveled. Behavior, threatening. Speech rapid, rambling. Mood angry. Affect, apathetic. Attention and concentration, inattentive. Memory, impaired. Thought process, illogical. Thought content, paranoid. Denies hallucination. Denies suicidal or homicidal ideation." (R.498; *see also* R.42-43 (discussing September 2019 hospitalization at step three); R.49-50 (discussing September 2019 hospitalization at step four)). The Court is left uncertain why the ALJ viewed this Discharge Summary as supporting Claimant having only moderate limitations in interacting with others.

The ALJ also said further restrictions beyond those in the RFC were not warranted because Claimant's examinations were "largely normal." In the Court's view, this conclusion, which the Court presumes underlies the ALJ's conclusory statement that the longitudinal record did not support the limitations endorsed by NP Waystout's opinion, is also not supported by substantial evidence. (R.56.)

The ALJ's discussion of Claimant's mental health treatment begins with a summary of her psychiatric evaluation at the UnityPoint Emergency Department on September 5, 2019. (R.49-50). The ALJ notes Claimant had taken "methamphetamines for the first time" on September 4, 2019, the day before she was admitted to the hospital. (R.49). The ALJ noted "while the claimant was positive for hallucinations, on examination she was alert and had a normal mood and affect" and she was transferred to the Chicago Behavioral Hospital with a diagnosis of mood disorder, depression, and drug abuse. *Id.* The ALJ described Claimant's reports of auditory and visual hallucinations while at the hospital, which Claimant said "began a week earlier" (which would appear to have been before Claimant's first use of methamphetamines the previous day), including that Claimant 'sees a little girl following her, hears people talking and sirens outside' and 'they seem like premonitions of what could happen.'" (R.50). Claimant "presented with suicidal ideation" including "a method to 'jump off of a bridge'," "reported daily panic attacks," that "she always feels angry and disorganized, and 'recently jumped in a random truck,'" and described "a dream that she was being shot to death, but that the dream felt real, so she woke up and 'freaked out'" which was why Claimant believed she was

20

hospitalized. *Id.* The ALJ noted Claimant threatened staff about her hospitalization. *Id.* The ALJ concluded Claimant "was hospitalized due to risk of harm to herself and to prevent further mental decompensation." *Id.* As Claimant notes, the consultative psychologist also expressed an opinion that Claimant would not be able to manage money independently, noting that "[d]ue to her emotional instability, the claimant is not able to adequately expend those funds that might be awarded to her" and would require a responsible payee, but the ALJ omits this finding from his opinion. Motion [ECF No. 20] at 7 (citing R.660). In the Court's view, this hospitalization does not appear to be a "largely normal" examination (indeed, an inpatient hospitalization would seem to be clearly not normal) and the ALJ does not explain whether or if he thought this hospitalization was "normal."

The ALJ then described records from North Central Behavioral Health in September 2020, where Claimant reported "bad anxiety" such that she was unable to be around other people or leave her house and Claimant was found to meet the criteria for generalized anxiety disorder and Bipolar I disorder. (R.50). Claimant was reported to "display[] hallucinations during her manic and major depressive episodes" and Claimant said her hallucinations in September 2019 were the result of "a lack of eating and sleep." *Id.* The ALJ observed Claimant was recommended for individual therapy but noted "less than three months after intake, claimant was discharged. . . due to noncompliance with attendance." *Id.* Based on this summary, it does not appear the September 2020 examination was "largely normal."

The ALJ also described Claimant's examination by NP Waystout in December 2020 for complaints of anxiety and anger issues, although the ALJ noted Claimant was "alert and oriented to person, place, and time and her thought content was normal" as were her "mood, behavior, thought content, and judgment." (R.52). Nevertheless, the ALJ also observed that Claimant was diagnosed with anxiety and recurrent major depressive disorder, in remission and prescribed multiple medications to treat these conditions. (*Id*.) The ALJ detailed another follow up examination by NP Waystout in February 2021 for migraines, where Claimant was described as "alert and oriented to person, place, and time" with normal thought content but she was also reported to be "inattentive, her mood was anxious, her affect was labile and angry, her speech was delayed, her behavior was slowed, and her judgment was impulsive." (R.52-53). The ALJ summarized the findings of this visit by noting Claimant was diagnosed with recurrent major depressive disorder, in full remission, as well as bipolar disorder and anxiety, and that she was prescribed additional medication for anxiety. (*Id*.) The ALJ does not explain whether or why he may have viewed the results of these examinations as "largely normal."

Finally, the ALJ summarized Claimant's May 2021 visit to the emergency room for a drug overdose where she reported taking too many Vicodin for hernia and back pain and was administered Narcan. (R.53). The ALJ noted Claimant could not remember how many pills she took, but that she "adamantly denied any suicidal intention" and on examination, Claimant reported she was anxious but "[h]er mental state was at baseline, and she was alert and oriented to person, place and time." (*Id*.)

22

Perhaps the ALJ viewed this as a "mostly normal" examination, but that is not explained in the opinion.

Following this summary of Claimant's mental health treatment record, the ALJ concluded in a single sentence that "the medical evidence fails to reveal any significant findings to indicate any greater limitations that those provided in the [RFC]" because Claimant "has received no surgery or treatment for any of her impairments other than medications for her mental health and fibromyalgia." (R.53-54). The ALJ did not further discuss the multiple mental health medications Claimant was prescribed from 2019 through 2021. The ALJ also dismissed the evidence regarding Claimant's "bizarre behavior and reports of auditory and visual hallucinations" during her September 2019 inpatient hospitalization because it "occurred after she acknowledged smoking methamphetamines." As noted above, however, the ALJ's summary of the hospitalization acknowledged Claimant's hallucinations were reported as beginning a week before the methamphetamine use was reported. The ALJ also did not address the other reports of hallucinations that he described in the record. The ALJ's summary conclusions about Claimant's mental health medical record are unsupported by sufficient analysis or explanation and are in many ways seemingly inconsistent with the medical record as described by the ALJ.

The Court finds the ALJ's cursory reference to the "longitudinal record" – the third and final reason provided by the ALJ to support his rejection of NP Waystout's

opinion – also fails to provide substantial evidence supporting the ALJ's decision.[5] "The categorical statements made by the ALJ are not supported (*sic*) the record in this case, and a more nuanced discussion regarding the supportability and consistency" of NP Waystout's opinion therefore "is necessary" in this case. *See Jomarie S. v. Kijakazi*, 2022 WL 2105916, at *4 (N.D. Ill. June 10, 2022) (ALJ's conclusion that treating psychiatrist and primary care doctor's opinions lacked record support and was not substantiated by objective medical evidence was not supported by substantial evidence); *see, e.g., Dana F. v. O'Malley*, 2025 WL 71759, at *5 (N.D. Ill. Jan. 10, 2025) ("the Court finds that the ALJ did not sufficiently expound upon the supportability and consistency of [doctor's] opinions" and "the ALJ's terse analysis falls short of what is required"); *Lucina H. v. Kijakazi*, 2023 WL 4533262, at *4 (N.D. Ill. July 13, 2023) ("the reasons the ALJ provided for discounting [doctor's] opinions are flawed and the ALJ otherwise failed to sufficiently explicate supportability and consistency in rejecting the opinions"); *Victor F. v. Kijakazi*, 2023 WL 2429357, at *4

---

[5] The Court acknowledges, as Commissioner argues, that the opinion of a nurse practitioner would never have been considered a treating source even under earlier regulations and therefore would not have been entitled to deference. Response [ECF No. 27] at 9-10; *see also* § 404.1527(a)(2) (a treating source is an "acceptable medical source"); *id.* § 404.1502(a) (not listing a nurse practitioner as an "acceptable medical source"); *Baptist v. Kijakazi*, 74 F.4th 437, 444 (7th Cir. 2023), *reh'g denied*, 2023 WL 6294252 (7th Cir. Sept. 27, 2023) ("Opinions authored by nurse practitioners are not entitled to controlling weight under the treating physician rule."). The Seventh Circuit has explained that for a non-treating source like a nurse practitioner, "the ALJ need only explain the weight given to [the] opinion 'or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning'" and "[i]t is enough for an ALJ to summarize the findings of a non-treating source's opinion and note that those findings are not corroborated by objective evidence in the record." *Pufahl v. Bisignano*, 142 F.4th 446, 457 (7th Cir. 2025). For the reasons explained above, the ALJ's conclusory statement that the longitudinal record does not support the limitations described in NP Waystout's opinion is insufficient to allow the Court to follow the ALJ's reasoning in rejecting that opinion.

(N.D. Ill. Mar. 9, 2023) ("the Court finds that the ALJ's treatment of [doctor's] opinion is insufficient because the ALJ completely failed to expound upon the supportability and consistency of the opinion"). Moreover, as discussed above, the ALJ's two other reasons for rejecting NP Waystout's opinion (the different handwriting and the recitation of subjective symptoms) both also fail to provide substantial evidence supporting his rejection of the nurse's opinion. Remand is therefore appropriate because "the ALJ failed to evaluate [an] opinion[] in accordance with 20 C.F.R. §§ 404.1520c(b)(2), and the reasons the ALJ gave for rejecting [the] opinion[] were either conclusory and unexplained, incorrect, or insufficient." *See Patrice W.*, 2022 WL 2463557, at \*5.

## B. The ALJ's opinion as to Claimant's subjective symptoms is not supported by substantial evidence.

Claimant also argues the ALJ's evaluation of Claimant's subjective symptoms is patently wrong. Motion [ECF No. 20] at 18-19. When assessing a claimant's subjective symptom allegations, an ALJ considers several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at \*5-8. "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). "Patently wrong" means that the decision lacks any explanation or support. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Not all the ALJ's reasons must be valid in a subjective symptom analysis, "as long as

enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (emphasis in original).

The ALJ concluded Claimant's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . ." (R.46). Specifically, the ALJ found Claimant's statements about her symptoms to be "inconsistent" with treatment records showing "while she occasionally reported mental and physical symptoms, she has had a routine set office visits with only conservative treatment consisting solely of taking prescribed medications" and "[w]hile there were some deficits present during mental examinations on occasion, a psychological consultative examination conducted on November 6, 2021 (*sic*) was unremarkable." The ALJ also found "claimant's characterization of her symptoms, and the extent to which they limited her is generally inconsistent with the medical evidence contained in the record" including because "throughout the period that the claimant alleged disability, she was able to engage in several activities of daily living." (R.46).

As an initial matter, as discussed in detail above, the Court finds the ALJ's conclusions that Claimant's medical record reflects largely normal mental health examinations and that the pschological consultative examination was unremarkable to be unsupported by substantial evidence.

Claimant also says it was error for the ALJ to characterize her mental health treatment as "conservative" given her history of inpatient treatment and because she has been prescribed many mental health medications with increasing dosages.

Motion [ECF No. 20] at 18-19. The Court agrees. As other courts have acknowledged, "[f]or mental health treatments, as opposed to physical health treatments, determining whether treatment is 'conservative' is not as clear." *See*, *e.g.*, *Davidson v. Kijakazi*, 2021 WL 3514703, at *4 (E.D. Wis. Aug. 10, 2021). While the ALJ acknowledged Claimant was prescribed medication by her primary care provider (NP Waystout) (R.55), the ALJ did not otherwise address the extent of Claimant's medication treatment. The ALJ does not address that Claimant was also prescribed mental health medication in September 2019 during and after her in-patient hospitalization. Motion [ECF No. 20] at 2-3. The Court acknowledges that treatment of mental health conditions with only medication could be characterized as conservative, but here, the ALJ does not explain why he viewed Claimant's medication treatment in this way.

The ALJ also focused on Claimant's failure to pursue therapy to support his characterization of her mental health treatment as conservative. The ALJ described Claimant's failure to pursue recommendations for individual therapy in late 2020, noted she "has had no therapy for her mental health" and concluded Claimant was "noncompliant with recommendations for therapy." (R.53, 55-56). The ALJ described Claimant's testimony that "in the last year or two she began experiencing hallucinations due to her manic episodes" as well as her testimony acknowledging "that she has not had any therapy due to transportation issues and difficulty being around people." (R.45). The ALJ also described Claimant's testimony that she was waiting for a new referral to another provider in LaSalle after the original provider

left the practice, and that she did not have transportation to the LaSalle location. (R.45-46). Notwithstanding the ALJ's acknowledgement of the reasons Claimant gave for not pursuing therapy, the ALJ did not address these explanations or attempt to resolve the legitimacy of Claimant's reasons for not pursuing therapy before relying on Claimant's non-compliance to discount her symptoms and deem her treatment to be conservative.

An ALJ must explore a claimant's reasons for not complying with treatment recommendations before relying on noncompliance to discount or discredit a claimant's testimony, particularly where mental health is at issue. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (ALJs must consider that "mental illness in general ... may prevent the sufferer from ... submitting to treatment"); *Theresa B. v. Kijakazi*, 2023 WL 4492381, at *2–3 (N.D. Ill. July 12, 2023) (citing SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017): "ALJ may not hold a claimant's failure to obtain treatment against her 'without considering possible reasons ... she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.'"). "An ALJ may not draw a negative inference about limited treatment without considering the claimant's explanations." *Robert G. v. Bisignano*, 2025 WL 1505425, at *5–6 (N.D. Ill. May 27, 2025)); *see, e.g.*, *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), *as amended* (Aug. 20, 2014) ("an ALJ may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not seek medical treatment or fully comply with prescribed treatment."); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a

history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The Court finds the ALJ erred in failing to address Claimant's reasons for not pursuing therapy while relying on that purported failure to characterize Claimant's treatment as conservative and discredit Claimant's description of her symptoms.

Finally, with respect to the ALJ's consideration of Claimant's daily activities, Claimant argues the ALJ erred in relying on her daily activities to discount her subjective symptoms and to conclude she was able to perform full-time work on a sustained basis. Motion [ECF No. 20] at 17, 19-20. At step three, when evaluating Claimant's functional abilities, the ALJ identified a number of daily activities that Claimant could engage in, including "cleaning the basement room that she stays in, washing dishes, doing laundry, sweeping and mopping floors, shopping for food and household items, counting change, handling a savings account, and using a checkbook/money order." (R.43). The ALJ noted Claimant "frequently sits around with family, although she mostly keeps to herself and refrains from talking" and she "has no problem with personal care other than needing someone in the room while bathing." (R.43). The ALJ observed Claimant "is capable of reading, coloring adult coloring books, and watching television daily" which the ALJ viewed as inconsistent with her testimony that she could not watch a movie from beginning to end. (R.43). The ALJ concluded Claimant's testimony regarding the intensity, persistance, and

29

limiting effects of her symptoms was inconsistent with, among other things, the fact that she was "able to engage in several activities of daily living." (R.46, R.56).

In the Court's view, the ALJ failed to explain how these described daily activities support his conclusions about the consistency of Claimant's subjective symptoms or the finding that Claimant could perform work with the limitations in the RFC. As an initial matter, the ALJ ignored evidence in the record about ways in which Claimant's ability to engage in the daily activities he described was limited. *See Maria G. v. O'Malley*, 2024 WL 2370309, at *2 (N.D. Ill. May 23, 2024) (remand required where ALJ mischaracterized the record in describing Claimant's daily activities and needed to "better address the testimony and evidence on Claimant's limitations in her activities of daily living and provide a more fulsome explanation how the limitations included in the RFC"); *Ivan R. v. O'Malley*, 2024 WL 3888843, at *3 (N.D. Ill. Aug. 21, 2024) (remand required where "ALJ does not address the context in which Claimant performs his daily activities, including the quality and level of overall functional performance, any limitations, the amount of supervision or assistance required, and the settings in which he is able to function."). For example, Claimant testified that she can sit with her family but "mostly keeps to herself and refrains from talking" and that she has no problem with her personal care but requires someone to be in the room with her while bathing. (R.42-43). The ALJ did not address these seemingly significant limitations in how Claimant is able to engage with her family or manage her self-care. "There is a difference between being able to perform activities of daily living while obtaining help from others as needed or

working at one's own pace and being able to engage in substantial gainful activity." *Ivan R.*, 2024 WL 3888843, at *3 (citing *RuthAnn G. v. Saul*, 2021 WL 2349671, at *9 (N.D. Ind. June 9, 2021) and *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Similarly, while the ALJ described instances where Claimant uses coloring books as a technique for calming her anxiety and emotions, the ALJ nonetheless relied on her "coloring adult coloring books" (in addition to reading and watching television) as showing Claimant was able to concentrate. (R.43 ("She noted in the written recod (*sic*) that she is able to perform watching television and coloring activities 'okay.'"). *See also* (R.42, R.51 (at consultative examination, Claimant "was rambling due to her extreme anxiety, and she rocked incessantly, drawing and coloring during the interview"); R.44 (Claimant's testimony that "she is not able to control her emotions . . . [and] during these times, she goes in a room by herself and colors or takes a nap")).

The ALJ also failed to explain how Claimant's ability to engage in these daily activities supports the RFC that Claimant can perform work involving "simple, routine tasks" and "make simple, work-related decisions" and occasional interaction with supervisors, coworkers, and the public. (R.44). The ALJ did not explain how Claimant's ability to engage in household activities such as cleaning her room, washing dishes, doing laundry, and sweeping and mopping translates into an ability to perform full-time work. The ALJ relied on Claimant's statement that she can handle a savings account and use a checkbook/money order, but did not reconcile that with the examining psychologist's conclusion that "[d]ue to her emotional instability,

31

the claimant is not able to adequately expend those funds that might be awarded to her" and would require a responsible payee. (R.660). Nor did the ALJ explain why Claimant's ability to sit with her family, albeit while keeping to herself and not talking, supports her ability to perform full-time work requiring occasional interaction with supervisors, coworkers and the public. The ALJ also said he accommodated Claimant's "deficits in attention, focus, concentration, persistence and pace" by restricting her to "simple, routine tasks" and "simple work-related decisions" but failed to explain how Claimant's ability to read, color and watch television translated into her ability to perform work on a full-time basis with those limitations. (R.54). *See Edie M. S. v. Bisignano*, 2025 WL 1399141, at *4 (N.D. Ill. May 14, 2025) ("Without further explanation, the Court does not see how Claimant's ability to swim, do yoga, or drive necessarily shows she could engage in frequent handling and fingering at work."; ". . .the ALJ does not explain why or to what extent Claimant's ability to engage in these activities translates into her ability to engage in handling and fingering frequently during a workday"). The Seventh Circuit has cautioned ALJs that "there are critical differences between keeping up with activities of daily living and holding down a full-time job." *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). "Activities of daily living can provide valuable insight into a claimant's functional abilities, but an ALJ must be careful not to go too far and 'equate the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of

incapacitation.'" *Edie M. S.*, 2025 WL 1399141, at *4 (quoting *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014)).

For all the above reasons, the Court finds remand is appropriate to allow the ALJ to further address the opinion evidence and Claimant's subjective symptoms consistent with this opinion.

## CONCLUSION

Accordingly, for all the reasons set forth above, Claimant's Motion for Summary Judgment [ECF No. 19] is granted as to Claimant's request for remand, and the Commissioner's request for summary judgment in Defendant's Response to Plaintiff's Motion for Summary Judgment [ECF No. 27] is denied.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: November 17, 2025